Good morning, good afternoon, good evening. Michael Stephan, jury for Apple v. Tracy Costa. The underlying issue in this case is whether DLJ, who denied climate or social security disruptive methods, relied upon substantial evidence, which she asserted came from two agency examiners. These examiners were involved in the case early in its process. The first examiner and CR Dan, and they're both physicians, reviewed the file to some degree, as we'll discuss, in July of 2008. Three months later, when the case was being reconsidered after Dan's decline of the benefits, Dr. Iskander, another agency examiner, reviewed the file to some degree, and also declined the benefits. The ALJ, when hearing this case in the summer of 2010, relied entirely on the two opinions of Dan and Iskander, and ignored at that time the opinions of practitioners who had been treating this woman, Tracy Costa, for five plus years. And he did exactly ignore them, because he did give reasons why he said that their estimate of her condition was inconsistent, and withdrew a discerning evidence. Which, Your Honor, is an inaccurate depiction of her testimony. Okay? And the record is replete with persuasive, hurtful renderings, consistently. Over the five plus years, the records are dealing with concern of her consistently describing limited activity, limited logic. Are you talking about Dr. Yabes? Is that one of the doctors? Dr. Yabes? Is that one of the doctors? Are you talking about Dr. Yabes? Is that one of the doctors? Okay. Boyd and Yates. Yeah. Okay. Yeah. I've been calling them dominance, but Yabes. I'm sorry, you've been calling them what? Y-A-B-E-S. Yabes. Yabes, okay. Okay. And that lengthy period of treatment does refer to him as well as his predecessor. Can you point to any objective medical findings in Dr. Yabes' medical records that would support the assessment here that accomplished the cost of limitations? Findings would support. Yes. He treated her for migraine headaches over the period of time. I didn't mention that, but the objective medical findings, because it seems what's happened here, he writes a lot of progress notes based on what she says, but the objective medical findings in terms of tests or anything along those lines, physical testing or his own observations, I'm not quite sure I see why the ALJ would have been erroneous for giving him the more limited view of his record. So. Well, for one thing, Your Honor, we're talking about migraine headaches, primarily what he's talking about is what pervasive pain syndrome, chronic fatigue syndrome, ailments which typically do not manifest with measurable clinical findings. And the law of the sport is that once it's been established, the diagnosis has been established that a person has this type of impairment, you don't necessarily look for a dipstick clinical finding, a measurable finding to validate it by nature. It wouldn't necessarily be there. Okay, but that doesn't totally answer your question. I appreciate it. He did at times note weakness and such, but certainly he was not developing a record of significant observable clinical findings. But the legal issue. Well, Your Honor, with Mr. Boyd, I'm having trouble anywhere in the record finding any evidence beyond Ms. Costa's own complaints that would support Dr. Boyd's opinion that Ms. Costa can never lift any weight whatsoever. There were some very broad statements made, and I understand one basis or, you know, he's factoring in the comments, the statements, the history of the patient. But it seems like what the ALJ said, which we have to determine whether it was reasonable or unreasonable in terms of whether it was supported, whether he made specific legitimate reasons, stated that they, that Dr. Boyd and Dr. Yelps, seemed to overstate because they were not supported by objective medical findings. They were just taking what you said, which may be possible, but I want to, this is where we're drilling down on whether or not the ALJ gave specific legitimate reasons for giving those doctors a more limited weight. Well, okay. So we need to look at the nature of the development, and this is critical. This woman here has a genetic disease that few understood. Dr. Boyd was an expert, but it sure happens that she stumbled upon this practitioner, geneticist, you see Davis, stumbled upon him who did the diagnosis, confirmed the existence of the disease. So we need to be thinking now about what are the characteristics of the disease. I'm sorry, because this is a progressive genetic disease. It's not as harsh initially unless you've gone half your life not understanding it or not being diagnosed. So is this record complete with enough objective medical evidence to support the findings of disability that you're seeking? Because it was in her earlier stages, especially in 2008. Right, and because getting back to that ALJ and how reasonable or unreasonable the decision was, there was never an understanding of the disease in all of its forms. It's progressive. In some people, in this thing, it was late developing. Certain aspects of it were late developing, and they were all thrown off. The ALJ and the two agency consultants, who never examined her, never met her, didn't even review all the records. They were thrown off by a lack of understanding of the disease. If you want to use their testimony, increasing pain is progressive.  Including spastic blighter, which was not perceived as relevant to any growth. And I have noticed by any of the folks that I just mentioned, the judge and the two consultants. So they didn't understand it. And the reason is the obvious symptom of this disease is syndactyly, which is a webbing in the digenous. Okay. She had that as a child. Pretty obviously related to something. It was familial. They corrected it. It didn't interfere with her life. She pursued her life. But then the late stage development of the progressive neuropathy, which brought this spectrum of symptoms that were unrecognized, even by the treating doctors in the first years, but never recognized by the ALJ or her consultants. And so that led us to a situation where we're talking about two different things. Dr. Boyd and his associates, many people whom she referred her to, eventually figured it out. And by those, I mean the specialists, associates or something. They all at one point called it, recognized, oh, my gosh, it's this rare disease. So this side got it. The other side didn't get it. They never get it. So they're saying in their reports, well, these progressive symptoms, late developing, raising their red flag, coming down, but this is suspicious. They never got it because they then recognized that the disease that has webbing early on does a whole spectrum of other things. And then based on that lack of recognition, the ALJ determines, well, she's not credible to the extent that she's alleging all this stuff that doesn't fit your typical neurologic orthopedic psychology. Sorry. But this is one about the credibility fight, because it seems that the ALJ found Ms. Coz to be less than credible because of her, where he concluded that the records show that her vein and her migraines were generally well controlled. It seems like the record supports that. You argue that that's erroneous, and I'm just trying to figure out why, because it does seem that the record supports, not really well supported because of the fact that it was controlled. She did have some times where she went to the emergency room. How many times did she go to the emergency room? Six out of a year. Yes, but through all the time that we have records for, this was a continuing phenomenon that was getting more frequent. So those were the critical headaches. But she testified that in terms of the migraine headaches, that she was having new ones every year. The overwhelming ones were the ones that took her to the ER. So, and I'm sorry, I'm drifting, and I forgot to read the book that you're asking about. I just wanted to, why was the ALJ erroneous with respect to that credibility finding, and if the migraines were, and the pain room was controlled by the medicine, it seems like Dr. Jobs' main function was to prescribe her the medicines. Is that right? It was. And then Dr. Boyd saw her once. Is that right? That's correct. So your main challenges to the decision is that the ALJ, who was erroneous in evaluating the medical appearance, opinions, or the medical evidence, you primarily focus on Dr. Jobs and Dr. Boyd. It seems like the ALJ gave some reasons, I'm just trying to figure out in the last couple of years, to see if they were specific and legitimate enough to show that they were substantial evidence to support him. The other area that you argue is the credibility determination. It seems that the ALJ argued or stated his reasons for making her give her full credibility is because after reviewing all the records, that therapy was relatively well controlled with the meds. So we're here to determine whether or not there was error, and so I'm going to give you an opportunity to respond to the issues you're raising on the panel. Okay. I appreciate that. May I reserve a couple of minutes for my time? I will try to respond to that. Okay. So you're down to one minute right now. Okay, well that's not a problem. I will respond. Thank you. Good morning. My name is Shane Mondo, and I'm the Advocate Commissioner of Social Security. I think Your Honors kind of hit the point in pointing out that the record here lacks the kind of objective support for the types of extreme limitations that Dr. Boyd and Dr. Yabe assess. Well, I have some questions in here for Mr. Sebra, but I have some questions for you too, Ms. Vaughn. On the headaches, this is really, you've heard this unique disease, one in 300 people have it in the world, apparently. It's a progressive disease. She suffers from headaches, and even though she was taking medication, she was having to see the doctor multiple times throughout the year to keep this under control. And she did have to go to the emergency room on a number of occasions. I think I read it was at least six times in a year, a year and a half. Why isn't that enough to say that the ALJ was erroneous? Well, you're correct. This is more unusual. It's a genetic condition. It's progressive. But I don't think the update can come lately. During the hearing and in the hearing position, the ALJ reaffirms that this is a complicated disease. It's a progressive disease. But what does the update say? And, yes, the claimant did go to the emergency room several times over this period. But I would point out that at least three of those visits related to a side effect from a spinal tap that she received. That was a very kind of discreet reason. Anybody, I think, if you've read about spiking a spinal tap for diagnostics, having excruciating headaches, it's a side effect for a period of time after that is an expected result. So, I would say that those were some of the reasons why this would be tied to her underlying condition. But the record also shows, as you're right on the point, that when she was taking her medication as prescribed, the headaches were controlled. And when she went to Dr. Chao, but it's C-A-O, C-A-O is the doctor's name, he had prescribed her pergolactic treatments and also kind of break out treatments. Oil packs and he threw them in with her drug. But when she was taking those drugs, she admitted that her headaches were well controlled. And, in fact, when she went back for her six-month follow-up with Dr. Chao, he noted that she had been migraine-free for six months. So, actually, the record was showing that she was taking her medication as prescribed, and she would take the medication and she would initially get the migraine that were controlled. And it also showed that at the time when it wasn't controlled, there was a description where she was in the mall and she left her breakthrough medication in the car. That's why the migraine persisted. So there's explanations in the record, which ALJ does acknowledge, that show that despite having this underlying process, whether it's migraine headaches or the ODDD, the medication was effective in controlling it. I just want to confirm, so Grace didn't address all the rest of her symptoms, so is that a broad paintbrush for an ALJ to pick on that and say, the migraines are under control, therefore the rest of this doesn't matter? I think the ALJ was talking about the medication in relation to the migraines. But the ALJ also talks about... But they're not. They're not. You're talking about everything. I'm talking about the migraine medications controlling the migraines, but for any condition, what's the other evidence have to show? And so when she was going for her treatment with Dr. Jabez, every time he documented her physical examination, he showed that she had five or five muscle strains in all of her extremities. So for someone who is experiencing the type of pain that Dr. Fleming was alleging, that she was especially vibrating during the day, that you would expect to see some muscle atrophy and muscle weakness. And so that is not what the treatment records over this long period of time showed. And all that Dr. Jabez did in response to when the payment came in described kind of this generalized weakness or pain. He prescribed a step for filling the medications. So, you know, again, when you're looking at a condition, he is progressive. And when Dr. Boyd initially, I guess, diagnosed the claim with the condition back in 2007, he did describe the types of ways that the condition can deteriorate. And so peripheral neuropathy is one of the conditions. It can deteriorate to the point where the person can no longer walk. He has feet instability and has feet wheelchair bound. We don't have this in this record. And we have Dr. Jabez' treatment records which consistently show that she had full muscle strains. But what for those treatments did she fail to take? It was, well, the ALJ found that she had been recommended to do strengthening exercises, and that there was no evidence in the record that she had pursued that type of treatment. And there was evidence in the record that with the migraine treatment, she wasn't necessarily taking that when she did have the migraines. It's because she ran out of her medications or that she hadn't taken the medication timely enough. So those are just a few examples. And, again, that's just one aspect of the ALJ cited in assessing both the doctor's opinions and the clinic's credibility. She also had conditions since 1990. She's had the genetic conditions since birth, but she doesn't have a long work history. She was a flight attendant for Southwest Airlines, so air conditions. And then after she was no longer able to do that job, she was working as providing care for her disabled daughter. When the clinic initially filed her application, she was going to be disabled until 2006. But the ALJ pointed out that she had a couple more years of substantial people activity, and she amended her on some things later. So it does show that even with this deterioration, we're not going to deny that the condition is somewhat deteriorating, but it hasn't deteriorated to the point where she cannot perform the job that she's performing as she's been approved as a caretaker for her own sick child. And that, I think, misconstrues the actual responsibilities of such a caretaker who are approved usually for a family member. Just to have someone watch over them, in this case, when her daughter had a left hip fit, does that require you be a doctor? It doesn't require you to be anything but there and call the right people. Why is that used by the ALJ here as gainful employment? Well, it's because, again, it's because of the extent of the limitations that the doctors assessed and claimant alleged. And it was alleged that any almost like minor movement of her neck or arms, just getting up, would trigger kind of a catastrophic pain, migraine headaches, or pain in the limbs. So it would be inconsistent to say that she would be to deal with the responsibility of caring for a child who has an epileptic seizure, a nighttime seizure, that she would be able to assist in that situation. I guess we don't understand the specifics of that. Can you point to a doctor or any credible treatise that says what was expected of her caring for her child and how that negated her credibility? Well, there wasn't a doctor who described it. But with her testimony, she described what was expected of her. And so that was at nighttime. If her child would have a seizure, she would be expected to assist her child. So given that doctors, Yavis and Lloyd, said that she couldn't, like, lift any weight at all, they didn't require her to lift any weight. They didn't require her to lift any weight. It seems that what she was doing as the caregiver for her daughter primarily requires her to sleep in the same room as her daughter in case her daughter has a seizure. I'm not quite sure I understand how the physical limitations in the patient's claim isn't consistent. Well, I would say that if someone's having an epileptic seizure, if they're coming to their assistance, there's going to be jarring motions, and that would be inconsistent with the set of her allegations and what triggers her. I just don't know where in the record there was evidence about what's necessary to take care of such a situation. Yavis, would you presume that she would be alone? Isn't it really to be a watch person? And there seems to be a broadening here of the application of she can do this one thing, then she must be able to do these other things. And it goes to her credibility as the ALJ determined it. Well, that's what's funny. I think you're trying to be exempt, but you feel that the ALJ relied relatively heavily on that aspect of her life. There were other daily activities. The ALJ also pointed out it could have been in conjunction with this. They'd be inconsistent with her allegations. And so it was her ability to drive, to take her children to Target or to the pool, her carrying out certain household chores during the day that was inconsistent, So I'm going to extend into that area of concern for me as well, if you're pointing to that, because the ALJ found that her activities were inconsistent with the limitations she assessed, but she consistently reported that she could perform these activities. I'm talking about that she relied heavily on her husband, on her oldest daughter, to help with shopping, preparing meals, and caring for the other children, to try to find any testimony or any section on her function, or Ms. Costa stated that she could perform her activities of daily assistance or maybe even without assistance. Do you point to that? No. No, and the ALJ didn't make that finding either. The ALJ found that she performed these activities. She claimed she had some assistance. But we're looking at, say, what the doctor says that she could do, and if they're saying that she's not lifting any weight whatsoever, her daily activities come to that. They don't have to be perfect. They don't have to just have to do them on the system. She doesn't have to do them eight hours a day. They just have to show that the activities she takes, she's doing is inconsistent. How do you view activities without assistance on her own? Well, to drive, I would say that if you are having these types of mind-to-mind brain headaches, it's just alleging you would not risk your child's safety by driving them around. It doesn't matter about acknowledging the medication. I mean, she was on medication. It seems like you're using that. If she claims that she was doing some things, I was able to tell things with medication, you're using that against her. And then if she claims that she would not be on the medication, you're using that against her. Well, if you were saying she claims she didn't need any medication, I don't think that's what you'd be able to use that. The point is that when she was taking medication, she's functional. She's not having any of the migraines. As for daily activities, it's showing that she's engaging in activities that are inconsistent with the level of limitations that she or the doctors claimed that she had. That's it. And, again, it doesn't have to be that she's fully functional. It just has to be the inconsistency. And so, again, if she's driving her children to the mall or to do a recreational activity, I would submit that it would just be – it doesn't make sense that someone would put that kind of safety issue with their children in their cars. That would be a lot to say that she drove with migraine headaches. But she values her safety. And that's an assumption that clarifies how the ALJ assessed her credibility. But I don't think it's an assumption because, at the hearing, she testified she has headaches all the time, every day. That was her own testimony. That's not the ALJ making that assumption. That was her testimony. And that's why the activities become important, because it's inconsistent with that allegation. One of the agency physicians said that she's capable of lifting 20 pounds occasionally and 10 pounds continually during a day. That she can stoop and kneel and crawl. And what part in the record supports those new clinics? You're asking what evidence supports the RFC from the whiteboard. So we did have the PCA agency doctors who reviewed the record in 2008 and who, after a thorough evaluation of the evidence they had, approved those opinions of the clinicians. And the whiteboard that was consistent with what the RFC, but the ALJ is also the RFC finding. I'm just asking specifically, is there any evidence that she can lift 20 pounds or lift 10 pounds repeatedly? And that's more than it has to do with her just regularly doing so? Well, she did say that she would lift items in her house. So, like, a gallon of milk. She said she was able to put a milker of food products around her house. So that would establish that she has, again, more functionality. And the CTA agency doctors. Does it establish that you can do RFCs to eat hours a day? Well, that's what we have our CTA agency doctors, who are the experts in evaluating this type of evidence and drawing a series of conclusions about a claimant's functionality. And so those two experts reviewed this record and reached that conclusion. And that's the opinion evidence that the ALJ relied upon to help formulate that RFC. There was evidence, non-medical, from her husband that was clearly rejected by the ALJ on credibility grounds. And was that not error because he was not a medical witness? That aspect of the rationale was error. So that was wrong. But the ALJ cited additional reasons, and that was the inconsistency with the objective evidence. And under the sports precedent in Ballantyne, you can have one or two inappropriate reasons for rejecting another source statement's description of the claimant's symptoms. As long as there's other valid reasons, it's the invalid reason because it was her husband's error. So because the ALJ cited the alternative valid reason, that same finding. And is it also error to accept and make findings based on the evaluations of the non-treating doctors as opposed to a doctor who treated, met, and an expert in the field in this type of symptomology, which, of course, the ALJ did too? Where is the balance there? And the law in the circuit that allows that to be acceptable? Well, under, I would say, they've cited Bray in our briefs. Bray allows the ALJ to rely on a CDC's working positions opinion over that of a DOJ positions opinion. But beyond that, the ALJ didn't just adopt the DDS opinions simply because they existed. The ALJ provided independent reasons for finding the treating positions opinions unsupported or inconsistent with the record. And, again, Dr. Boyd saw the claimant once in 2007. Dr. Yavis had a continuing treatment voice. She was able to claim that, well, when you look at these treatment records, all the examination findings establishable are normal. And just briefly on her medications, which does mean the significance of an expert in a medical field who is brought in for whatever purpose, usually to diagnose and treat and develop a plan. And the experts work with the regular doctors, of which she had several. And that's usually how it's done. How does it mean the significance of the expert doctor? Do you mean Dr. Boyd? Because Dr. Boyd, the only treatment record he has remains in 2007. He did send the claimant out to some specialists, but that was also in 2007. So in all those specialists who came back with normal results, the cardiac test was normal. Neurological, their concussion studies were normal. She went to a urologist for her bladder spasticity, and they just recommended she get treatment. And there's really no more discussion about that in the record. So at the time that Dr. Boyd sent the claimant out to the specialists, all the test results were coming back negative normal, which again would show that she's still at earlier stages of the process of this autoimmune disease. It could deteriorate to a point where she's disabled, but that's just not what the record showed at this point in time. Thank you very much. Thank you very much. Cassie, you're first. Sure. I think we were talking about the headaches and why what was missed by the ALJ and the agency consultants with respect to the headaches. One thing that was very obviously missed was the fact that she was taking more than just pain meds for the headaches. She was taking prophylactic medications for the headaches, vascular contraction medications. This was pointed out by one of the clerks, the clerk that actually did the record review and commentary for Dr. Iskander. It was pointed out to him that Dr. Tan totally missed the headache issue, and Dr. Iskander in his first review mentioned headaches can't be too much because she's not taking, hasn't taken prophylactic meds. The clerk comes in and lists no less than six or more prophylactic medications over the years up to mid-summer 2008 that she had been taking, some with negative effects, with loss, muscle issues that were developed as a result. And so clearly indicating in his belly, the ALJ adopting this, that not taking prophylactics, hence not a big deal. Well, was taking prophylactics. And from one stop working, they would prescribe enough and she would take them. So not only cooperative, doing everything possible to control the headaches. If they were controlled, they wouldn't have been switching those prophylactics so often over so long a period of time. Thank you very much. Mr. Schneckle and Ms. Vaughn, thank you both for your remarks. And it's here today that the paper of Tracy Thompson-Costa and of course Nancy Burrell will be submitted.
judges: Canby, Murguia, Rufe